**SUZUKI LAW OFFICES**
Attorneys at Law
Richard J. Suzuki, Esq. No. 021348
Seth Apfel, Esq. No. 032225
2929 E. Camelback Rd. Ste. 224
Phoenix, Arizona 85016
Phone: (602) 682-5270
Fax: 480-907-1571
Attorneys@suzukilawoffices.com

Attorneys for Defendant *Lopez-Garcia*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:18-cr-01212-DLR-1 |
| Plaintiff, | **MOTION TO SUPPRESS** |
| vs. | (In custody) |
| Jesus Ivan Lopez-Garcia, | **(Evidentiary hearing requested)** |
| Defendant. | |

Defendant, Jesus Ivan Lopez-Garcia, by and through counsel undersigned, respectfully requests that this Court suppress evidence seized as a result of an illegal search and seizure, in violation of the Fourth Amendment to the United States Constitution. Specifically, police officers impermissibly extended the duration of a traffic stop in order to conduct a dog sniff, in direct violation of clearly established law. Since the search and continued detention were illegal, and further since there was no intervening circumstance to overcome the taint of the illegality, everything that occurred following the

-1-

impermissibly extended duration is tainted by the illegality and requires suppression, including all statements made by the defendant, all evidence found during the search of the car, and all evidence obtained pursuant to warrants that were issued in reliance on what was found during the search of the car.

This motion is made pursuant to the Fourth Amendment to the United States Constitution, and Rule 12 of the Federal Rules of Criminal Procedure, and applicable precedent. This motion is further supported by the following Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this [not filed].

**SUZUKI LAW OFFICES**

*/s/ Seth Apfel*
Seth Apfel
Attorney on Behalf of Defendant *Lopez-Garcia*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      STATEMENT OF FACTS**

On August 13, 2018, federal officers were conducting remote electronic surveillance at 552 San Luis Plaza Drive in San Luis, Arizona. [Ex. 1, Report of Investigation (ROI) at p. 0021].  It is unknown how or why this property came to be placed under surveillance – no information in that respect has been provided to the defense to date.

-2-

At approximately 4:11 PM, agents saw a white pickup truck at the location and began physical surveillance. [Id.].  The pickup had an "Xtreme Electric. Inc." logo and was towing an open utility trailer. [Id.].  The agents saw a male, later identified as Jesus Ivan, Lopez-Garcia, walking in and out of the property. [Id.].

At 5:03 PM, the male closed the doors to the building, which had been opened; he remained inside the building and appeared to be speaking on a cell phone. [Id.].  At 5:22 PM, he left the building and loaded two black, plastic tote boxes onto the trailer. [Id.].  He drove away from the property at 5:30 PM. [Id.].  Agents followed the truck as it drove off. [Id.].

Fifteen minutes after the truck left the property, San Luis Police Officer J. Vasquez allegedly observed an equipment violation, followed by two moving violations. [Id.]. Vasquez conducted a traffic stop at 5:45 PM. [Id.].  Vasquez was able to quickly verify that both the truck and the trailer were registered to Lopez-Garcia. [Id.].  Vasquez claims that Lopez-Garcia provided him with an expired registration and insurance card with accurate information about the pickup. [Ex. 2, San Luis Report of Vasquez (Vasquez)]. However, per his report, Vasquez subsequently completed checks on the registration and on Lopez-Garcia's driver's license, after which he was going to issue only a repair order for an observed violation. [Id.].

Twenty-eight minutes later, San Luis Police Officer E. Cardenas arrived to assist Vasquez. [ROI at 21].  It is unknown why Vasquez needed assistance for a routine traffic stop, it is unknown where Lopez-Garcia was during this time (it is believed he had been

-3-

removed from the truck), and it is unknown what the officers were doing during this time, because the officers' reports do not provide a clear timeline of events, and an audio recording appears to contradict many of the officer's claims (as discussed further below). Cardenas was accompanied by his certified dog, and used the dog to conduct a drug sniff. [Id.].  The dog alerted to the trailer, specifically to the two black totes. [Id.].  Cardenas informed Vasquez of the alert, and Vasquez searched the totes and found wrapped packages believed to contain drugs. [Id. at 0022]. The packages were later discovered to contain considerable amounts of several different drugs. [Id.].

Though the ROI does not include this information from the San Luis Police Reports, in those reports, Vasquez claims that Lopez-Garcia was exhibiting odd behaviors during the traffic stop, and it is common practice to request a second unit under such circumstances. [Vasquez].  However, as indicated above, the second officer Cardenas did not arrive until twenty-eight minutes into the stop. [ROI at 21].  The way Vasquez's report reads, sometime after Cardenas arrived, but before any dog sniff, he asked Lopez-Garcia whether he could search the truck, and Lopez-Garcia gave him consent. [Vasquez]. Vasquez then asked if Lopez-Garcia had a problem with the canine conducting a sniff of the outside of the pickup, and Lopez-Garcia did not give consent or refuse other than to say he could say no. [Id.].  Vasquez then asked Cardenas to conduct a dog sniff, which led to the dog eventually alerting at the totes. [Id.].

Per the report of Cardenas, when Lopez-Garcia was asked for permission to conduct the dog sniff, he stuttered, and Vasquez took the answer as a denial of consent. [Ex. 3,

Report of Cardenas].  Nevertheless, Cardenas told Lopez-Garcia that the sniff would be conducted, and went on to do the sniff. [Id.].

Defense counsel eventually obtained an audio recording of the traffic stop made by police. [Ex. 4, Audio Recording (Audio)].  There is apparently no video, despite the fact that the San Luis police web site, they previously issued a press release saying (1) that all of their vehicles have dash board cameras; and (2) 20 of their officers were issued body worn cameras, and they would have body cameras on all officers by 2015.[1]

It should be noted, on April 25, 2018, an independent consulting firm performed a comprehensive organizational assessment of the San Luis Police Department. [Ex. 5, San Luis Police Organizational Assessment (Assessment)].  Among the findings of that assessment included determinations that San Luis Police, inter alia, have outdated policies, have significant problems with evidence storage procedures, including missing, stolen, and intermingled evidence, and have had issues with misconduct and insufficient internal affairs investigations and procedures, as well as a lack of any early intervention system to identify problematic employee behavior. [Id.].  This report is especially alarming considering (1) the apparent failure of Vasquez and Cardenas to preserve or record parts of the traffic stop; and (2) the doubt cast on the veracity of claims made by Vasquez as well as problems with his behavior during the stop, as discussed further below.

---

[1] See http://sanluispolice.org/tag/body-cameras/

-5-

The audio recording sheds considerable doubt on the claims made by Officers Vasquez and Cardenas in their reports.  As an initial matter, it is unclear at what point in the stop the recording begins – however, there is never any request for driver's license, registration or insurance, no discussion of any violations, and Lopez-Garcia is clearly not in his truck. [Id.].  The audio begins with Vasquez questioning Lopez-Garcia about what he had been doing at the 552 San Luis Plaza Drive location, and Lopez-Garcia telling him he has been doing construction work there. [Id.].  Vasquez asks Lopez-Garcia about the black totes, and Lopez-Garcia tells him there are tools in them, that his employees had left them at the location for him to pick up. [Id.].

About two and a half minutes into the recording, Vasquez asks Lopez-Garcia if there is anything in his pockets, and after Lopez-Garcia says there is not, Vasquez handcuffs him and places him under arrest. [Id.].  It is unclear what the basis was for arrest at that time, as the recording on the whole indicates that the dog sniff had not yet been done on the totes. [Id.].  At 5:45 of the recording, radio traffic can be heard referencing the "suspect vehicle." [Id.].  From that point, Vasquez and Lopez-Garcia engage in a lengthy conversation, first for about four to five minutes about speaking English (Lopez-Garcia says numerous times that his English is not good, which brings into question any consent to search even if given, since it was not given in Spanish), then about general construction information. [Id.].  At no time is any other person audible on the recording during this lengthy conversation. [Id.].  Finally, between 14:00 and 15:00 of the recording, discussion can be heard amongst

-6-

Vasquez, Lopez-Garcia, and (presumably) Cardenas indicating that dogs have alerted, and they have opened the totes and found drugs. [Id.].

Subsequent to the discovery of the drugs, federal agents interviewed the wife of Lopez-Garcia. [Id. at 0025-27].  They also obtained a search warrant for the property at 552 San Luis Plaza Drive, [id. at 0029; Ex. 2, Search Warrant and Affidavit (SW1) at 0058-78], and 2317 E. County 17th St., Yuma, AZ [Id. at 0032; Exh. 3, Search Warrant and Affidavit (SW2) at 0037-57].  Evidence was recovered and developed through the interview as well as during each search. [Id. at 0025-27, 0029, 0032].  Search warrants were also obtained for cell phones seized by police. [Ex. 4, Cell phone Search Warrant and Affidavit (SW3) at 0001-16].

The warrants for the two properties and the search warrant for the cell phone included affidavits that are substantially similar. [SW1 at 74-77; SW2 at 0052-56; SW3 at 0011-13].  Respecting events that occurred prior to the traffic stop, the only additional information that was in the warrant affidavits included the following:

- Agents had begun surveillance of the 552 property on August 1 (no reason is provided in the affidavit).
- They had observed Xtreme Electric cars on the property before, as well as at the home of Lopez-Garcia.

- They had seen people on the property doing construction – the property had been purchased by Lopez-Garcia in April, and there were no active construction permits and power had not been turned on.

- After effecting the traffic stop, Vasquez identified Lopez-Garcia as the driver, and Lopez-Garcia told Vasquez he had been working at the KFC; the 552 property is a former KFC.

[SW1 at 74-77; SW2 at 0052-56; SW3 at 0011-13].

## II.   LAW & ARGUMENT

### A. San Luis Police illegally extended the duration of a traffic stop in violation of *Rodriguez v. United States.*

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio,* 392 U.S. 1, 9 (1968); *United States v. Cortez,* 449 U.S. 411, 417 (1981)); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).  Police may not detain a person "even momentarily without reasonable, objective grounds for doing so." *Florida v. Royer*, 460 U.S. 491, 498 (1983).

A routine traffic stop is analogous to a *Terry* stop, so in both contexts, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citing *Knowles*

-8-

*v. Iowa*, 525 U.S. 113, 117 (1998), *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (internal citation omitted). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id*. (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985); *Royer,* 460 U.S. at 500; *Caballes*, 543 U.S. at 407) (brackets in original). Consequently, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed," *id*. (citing *Sharpe*, 470 U.S. at 686), and a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a warning ticket," *id*. at 1614-15 (citing *Caballes*, 543 U.S. at 407) (brackets in original), or if unrelated inquiries extend the duration of the stop. *Id*. at 1615 (citing *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)).

In the context of a traffic stop, "an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id*. (quoting *Caballes*, 543 U.S. at 408). Such inquiries include checking the driver's license, determining whether the driver has outstanding warrants, and inspecting registration and proof of insurance. *Id*. (citing *Delaware v. Prouse,* 440 U.S. 648, 658–660 (1979)). In contrast, a dog sniff "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id*. (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). Accordingly, the Supreme Court held that a police stop that exceeds the time necessary for handling the matter that formed the basis for the stop becomes unlawful if prolonged in order for police to conduct a dog sniff. *Id*. at 1612-1616. The Court also held that whether a dog sniff, or other police action prolonging a stop,

-9-

occurs before or after completion of the matter that led to the original stop has no bearing on the lawfulness of police action prolonging a stop, instead holding that the relevant issue is solely whether the stop was prolonged beyond what was necessary for the purpose of the stop. *Id.* at 1616.

In *Rodriguez*, a K9 officer pulled a driver over for a justifiable traffic stop, and, after completing the purpose of the stop, including running a records check on the driver, the officer asked for permission to conduct a dog sniff. *Id.* at 1613.  The defendant refused consent, and the officer directed him to get out of the car and wait for a second officer that had been called to the scene. *Id.*  After the second officer arrived, the first officer retrieved his dog and conducted the dog sniff, which resulted in an alert. *Id.*  A subsequent search of the car found drugs. *Id.*  In total, *the stop was only extended seven or eight minutes* by the officer's actions in conducting the dog sniff. *Id.*  Nevertheless, the Court found that to be unacceptable, holding that the officer had impermissibly prolonged the duration of the stop by conducting the dog sniff. *Id.*

The Ninth Circuit has followed the mandate of *Rodriguez* in subsequent decisions. In *United States v. Evans*, a Nevada sheriff's deputy had received information from two sources that the defendant was distributing methamphetamine. 786 F.3d 779, 781 (9th Cir. 2015).  The deputy later received additional, very specific information from an informant, based upon which he obtained authorization from a State court judge to track the defendant's location through his cell phone. *Id.*  Based on the information from the informant and the location of the cell phone, the deputy believed that the defendant had

-10-

just picked up a load of methamphetamine; accordingly, he contacted another deputy who had a his drug dog with him, supplied the K9 deputy with information about the defendant's car, and asked the K9 deputy to assist by parking along the side of the highway and waiting for the defendant's car to pass by. *Id*.  The K9 deputy did as was requested, and pulled over Mr. Evans for alleged traffic violations, including unsafe lane changes and following too closely. *Id*. at 782.  When the deputy approached the car and asked for a driver's license, he smelled a strong odor of methamphetamine. *Id*.  He had the defendant step out of the car, asked him several questions, and patted him down for weapons. *Id*.  He additionally questioned the passenger, noting that she was acting very nervously. *Id*.

After conducting a records check on both the defendant and the passenger, and finding that their records were clean, the deputy, as well as a second police officer that had arrived, conducted an ex-felon check (which revealed the defendant had two prior drug related convictions) and discussed what they had heard from the two occupants of the car. *Id*. at 783.  The deputy asked the defendant if he would answer a few more questions, and then asked about contraband in the car; the defendant denied having any. *Id*.   He further asked for consent to search the car, but the defendant refused. *Id*.   Believing he had reasonable suspicion, the deputy conducted a dog sniff, which ultimately led to the discovery of drugs in the car. *Id*. at 784.

Considering the totality of the circumstances, the Ninth Circuit, citing *Rodriguez*, held that *both* the ex-felon check and the dog sniff, each of which was unrelated to the traffic violation that formed the basis for the stop, prolonged the duration of the stop beyond

-11-

the time reasonably required to complete the purpose of the stop. *Id.* at 786. Notwithstanding the information that the deputies had gathered, since the justification for the stop was a traffic violation, the Court, in applying *Rodriguez*, noted that, in order to justify extending the duration of the stop, the deputies had to first *independently* develop reasonable suspicion to justify each prolongation. *Id.*

Similarly, in *United States v. Gorman*, 859 F.3d 706 (9th Cir.), the Court struck down a prolonged search as illegal. There, the government even conceded the initial illegality where the defendant was detained for nearly half an hour (note that this is the same amount of time at issue in the present case) for traffic violations, a period during which the police conducted "non-routine investigative inquiries and questioned Gorman about matters unrelated to the traffic infraction." *Gorman*, 859 F.3d at 715. Such inquiries, the Court held, went beyond the bounds of the ordinary mission of such a stop, and were "impermissibly 'aimed at detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (quoting *Evans*, 786 F.3d at 788). Consequently, "[d]etaining Gorman longer than it took to complete the stop's mission unquestionably violated the Constitution." *Id.*

Here, San Luis Police, whether or not at the direction of federal agents, effected a traffic stop respecting Lopez-Garcia. Assuming, *arguendo*, that the stop itself was lawful, the warrants and law enforcement reports are consistent in clearly delineating that the purpose of the stop was for an equipment violation and two moving violations.

The reports are equally clear in indicating that the truck and trailer were registered to Lopez-Garcia, and the driver was identified as Lopez-Garcia, and this was done well

-12-

before Cardenas arrived.  As such, prior to the arrival of the K9, Vasquez had verified

identity, registration, and that there were no warrants.  The only other aspect of the mission

of the stop would have been to write citations or warnings.  Yet Vasquez continued to

detain Lopez-Garcia, for a total 28 minutes, before the arrival of Cardenas with the canine.

In fact, the audio recording indicates that Vasquez actually arrested Lopez-Garcia, without

probable cause, and engaged in a lengthy conversation with him while waiting for Cardenas

to arrive.  While Vasquez claims that Lopez-Garcia consented to a search of his truck,

Vasquez's other claims are belied by the audio recording, and thus cannot carry any weight.

The recording includes no consent, it includes no request for consent (either for a search of

the truck or for a dog sniff), it begins well before the arrival of Cardenas and makes it clear

that Vasquez is passing time while waiting, and Lopez-Garcia told Vasquez repeatedly that

he does not speak English well.

It is also clear that, during this apparently fourteen minute span between the

beginning of the audio and when the dog actually alerted, Vasquez was no longer engaged

in any function related to the mission of the stop.  No explanation exists in any evidence to

justify the significant and impermissible extension of the duration of the traffic stop.  At

the time, the officers had no basis to believe that criminal activity was afoot.  Assuming,

*arguendo*, that they could consider events that had occurred at the 552 property, the

information that they had was consistent with a man who owned a property and was doing

construction on that property.  Lopez-Garcia's responses and relaxed conversation with the

officers further supported the notion of a lack of criminal activity.  Nothing in the warrant

-13-

affidavits or report of investigation provided any basis for a particularized and articulable suspicion, respecting information available to law enforcement prior to the stop, that Lopez-Garcia was engaged in criminal activity.  To the contrary, officers had nothing more than hunches.

In light of the forgoing, and particularly given the clear evidence of failure to pursue the mission of the stop as shown in the audio recording, Vasquez illegally extended the duration of the traffic stop in order to wait for Cardenas to arrive and conduct a dog sniff. The impermissible extension, violated the Fourth Amendment and clearly established case law, as described above.  Since the search and continued detention were illegal, and further since there was no intervening circumstance to overcome the taint of the illegality, everything that occurred following the impermissibly extended duration is tainted by the illegality and requires suppression, including all statements made by the defendant, all evidence found during the search of the car, and all evidence obtained pursuant to warrants that were issued in reliance on what was found during the search. *See Utah v. Strieff*, 136 S. Ct. 2056, 2062-63 (2016).

**B.    The failure of police to preserve the stop completely via video and/or audio recording violated Lopez-Garcia's due process rights, warranting suppression. Alternatively, such failure warrants the Court's application of an adverse inference against the government respecting the claims of Vasquez and Cardenas about the lawfulness of the stop.**

"[T]he due process principles announced in *Brady* and its progeny [apply in] a suppression hearing…" *United States v. Barton*, 995 F.2d 931, 934-35 (9th Cir. 1993) (referencing *Brady v. Maryland*, 373 U.S. 83 (1963)).  In *Barton*, the defendant argued that

-14-

a violation of due process occurred because the government failed to preserve marijuana plants, denying him access to evidence that may have impeached allegations in a search warrant. 995 F.2d at 933. The Ninth Circuit recognized that the Supreme Court had held a defendant has a Fourth Amendment right "to challenge the truthfulness of statements made in an affidavit supporting a search warrant," and the probable cause requirement "would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile." *Id*. (citing *Franks v. Delaware*, 438 U.S. 154, 156 (1978)). The Court reasoned that the rationale from *Franks* "applies with equal force to the destruction of evidence which is necessary to impeach material allegations in an affidavit for a search warrant." *Id*. at 935. Since the destruction of impeaching evidence could allow an officer to escape a challenge of false search warrant allegations, a defendant would effectively be deprived of his right to challenge the validity of the warrant. *Id*. Thus, the Ninth Circuit held that the application of *Brady* principles to suppression hearing evidence *is necessary to protect the right of privacy. Id*.

The government's failure to preserve potentially exculpatory evidence rises to the level of a due process violation only if the defendant shows that the government acted in bad faith. *United States v. Robertson*, 895 F.3d 1206, 1211 (9th Cir.) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the

-15-

evidence, the evidence could not have been destroyed in bad faith." *Id.* (quoting *United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015)).  In *Zaragoza-Moreira*, the court found that law enforcement acted in bad faith because they did not preserve video evidence that would have supported or refuted the defendant's repeated claims that she had acted under duress and tried to signal law enforcement. *Id.* at 1212.

Here, despite the fact that San Luis, per its own press release, typically has dashboard cameras for all of its vehicles, and body cameras for all of its officers, no video exists to support the officers' claims respecting what occurred during the traffic stop. Moreover, significant evidence appears to refute the claims of Vasquez – officers do not typically follow a person for 15 minutes prior to finally stopping him for a traffic violation. In addition, the audio recording is partial – the fact that it exists at all indicates that the officers knew that preservation of the interaction with Lopez-Garcia was of important evidentiary value, yet they only recorded a part of that interaction, and made claims that Lopez-Garcia gave consent to search the truck that were conveniently not on the audio recording.  The lack of preservation is all the more troubling given Lopez-Garcia's repeated assertions that he does not speak English well, and the conversation the officers had with him was entirely in English.  Finally, as indicated by the organizational assessment, San Luis Police have a track record of engaging in evidentiary malfeasance and professional misconduct, further heightening the probability that misconduct occurred.

In consideration of the above, law enforcement clearly knew the potential usefulness of recording the interaction with Lopez-Garcia, yet failed to record significant parts of that

interaction, despite San Luis policy respecting dash and body cameras. The failure rises to a level of bad faith that in itself is a due process violation requiring suppression of the evidence.

Even if this Court does not find that there is a sufficient basis for a finding of bad faith, in accordance with *Barton*, the Court may apply an adverse inference to any claim by the officers respecting the lawfulness of the search. An adverse inference[2] is appropriate "when the balance between 'the quality of the Government's conduct and the degree of prejudice to the accused' weighs in favor of the defendant. *Robertson*, 895 F.3d at 1213 (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring)). "The government bears the burden of justifying its conduct, while the defendant bears the burden of demonstrating prejudice." *Id*.

In addressing the first prong, the government's conduct, a court must consider, *inter alia*, "whether the evidence was lost or destroyed while in the government's custody, whether the government acted in disregard of the defendant's interests, whether the government was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification." *Id*.

---

[2] Generally, the law is that an adverse inference instruction is appropriate based on the balancing test described herein; however, it would be absurd for the court to give itself an instruction. Thus, as the finder of fact, the Court may apply the adverse inference if warranted.

Here, it is unknown why San Luis police did not follow their normal protocol and make sure they had active body/dash cameras rolling during the traffic stop. It is particularly troubling that the officers apparently demonstrated sufficient knowledge respecting the evidentiary value of the conversation with Lopez-Garcia that they recorded part of the discussion, but yet apparently failed to record all of it. It is also troubling that the officers followed Lopez-Garcia for fifteen minutes before stopping him, indicating that they had ulterior motives for the stop, and failed to question him in Spanish or seek consent in Spanish despite his clear indication that he did not speak English well. Most disturbing is the fact that the audio recording appears to directly contradict claims made by Vasquez about the stop itself. There does not appear to be any reasonable justification for the officers' failure to preserve evidence, and there does appear to be an indication that the failure was deliberate.

With respect to the second prong, in considering prejudice to the defendant, the Court must "consider the centrality and importance of the lost evidence to the case, the probative value and reliability of secondary or substitute evidence, the nature and probable weight of inferences and kinds of proof lost to the accused, and the probable effect on the jury from the absence of the evidence." *Id*. at 1214.

Here, a complete recording of the stop would have been absolutely critical to the case. Had the officers preserved a recording of the stop, there would be no questions respecting factual issues whatsoever, there would only be the question of whether the officers' actions were lawful. The only evidence remaining is a partial and incomplete

-18-

recording, and the word of the officers as compared to the word of Lopez-Garcia. The officers cannot be permitted to refuse to preserve evidence and then have the defendant suffer for lack of evidence because they failed to preserve evidence.

In consideration of the forgoing, suppression may be warranted for the due process violation, and even if it is not, an adverse inference against the lawfulness of the stop and the testimony of Vasquez and Cardenas is warranted due to the failure of the officers to preserve evidence despite the fact that they were aware of the evidentiary value of such evidence.

## III.    CONCLUSION

In consideration of the forgoing, Mr. Lopez-Garcia respectfully requests this Court suppress evidence seized as a result of an illegal search and seizure, in violation of the Fourth Amendment to the United States Constitution. Specifically, the police officer impermissibly extended the duration of a traffic stop in order to conduct a dog sniff, in direct violation of clearly established law. Since the search and continued detention were illegal, and further since there was no intervening circumstance to overcome the taint of the illegality, everything that occurred following the impermissibly extended duration is tainted by the illegality and requires suppression, including all statements made by the defendant, all evidence found during the search of the car, and all evidence obtained pursuant to warrants that were issued in reliance on what was found during the search.

**RESPECTFULLY SUBMITTED** this [not filed].

**SUZUKI LAW OFFICES**

By: */s/ Richard J. Suzuki*
Richard J. Suzuki
Attorney for Defendant *Lopez-Garcia*


By: */s/ Seth Apfel*
Seth Apfel
Attorney for Defendant *Lopez-Garcia*

-20-

**CERTIFICATE OF SERVICE**


I hereby certify that on [not filed], I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrants:


Honorable Susan M. Brnovich
UNITED STATES DISTRICT COURT
Brnovich_chambers@azd.uscourts.gov

Keith Eric Vercauteren
Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
keith.vercauteren@usdoj.gov

Maria Rodriguez Gutierrez
Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
maria.gutierrez@usdoj.gov


By: */s/ Richard J. Suzuki*
    Richard J. Suzuki
    Attorneys for *Lopez-Garcia*


By: */s/ Seth Apfel*
    Seth Apfel
    Attorneys for *Lopez-Garcia*